[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 8, 2006
THOMAS  K. KAHN
CLERK

_____

No. 03-14279

_____

D. C. Docket No. 01-00773 CR-3-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KELVIN PICKERING,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 8, 2006)**

Before BLACK, HULL and FARRIS[*], Circuit Judges.

PER CURIAM:

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Kelvin Pickering appeals his conviction and sentence imposed for possession and conspiracy to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 846. Pickering asserts the district court erred by (1) denying his motion for a new trial because the Government failed to offer sufficient evidence to convict him on all counts charging him in the indictment, and (2) enhancing his sentence for an abuse of a position of trust pursuant to U.S.S.G. § 3B1.3, in violation of *United States v. Booker*, 125 S. Ct. 738 (2005). We conclude the district court did not err, and affirm Pickering's conviction and sentence.

## I. BACKGROUND

Pickering was charged in a two-count indictment, along with co-defendants Troy Morton and Nijo Turnbull with (1) conspiracy to possess with intent to distribute at least five kilograms of cocaine, and (2) possession with intent to distribute at least five kilograms of cocaine. Pickering pled not guilty and his case proceeded to jury trial.

A. *The offense*

On June 29, 1999, two airline passengers, Jamila Jones and Clement Robert were found carrying cocaine while en route from St. Thomas, Virgin Islands to Raleigh-Durham, North Carolina. Jones' and Robert's bags were inspected and

the cocaine was discovered when they arrived for a connecting flight at the Hartsfield International Airport in Atlanta.

B. *Trial*

Jones testified for the Government. She stated she was recruited by co-conspirator Troy Morton to transport the cocaine, and that Morton asked her to pick up the narcotics in the Virgin Islands and transport them to North Carolina. The day before Jones left St. Thomas with the narcotics, she met Pickering in a parking lot. Jones learned Pickering worked in security at the airport.

Later, co-conspirator Nijo Turnbull gave Jones a telephone number, writing it across the top of her airline ticket, and explained Jones should call the number once she got to the airport. Jones cleared customs at the airport, and as planned, she called Pickering, who she knew only as "Kelly," using the telephone number given to her by Turnbull. Pickering answered the number and told her he would meet her inside the terminal. While waiting for him, Jones wandered into a bookstore inside the terminal. While in the bookstore, she turned around and observed Pickering with a bag almost identical to her own. As the two stood in line at the bookstore, they switched bags and went in separate directions. Jones then boarded her flight for Atlanta. She was arrested with the bag containing cocaine at the Atlanta airport.

Customs Special Agent Andre Watson testified that, after Jones' arrest, he determined Pickering went by "Kelly" and had full access to all areas of the airport. Agent Watson prepared a photographic lineup including Pickering, and Jones selected Pickering as the person who gave her the cocaine.

Customs Special Agent William Westman explained he supervises all of the Customs employees at the St. Thomas airport. He testified that Pickering would have access to the area where he and Jones exchanged the bag containing the narcotics. Additionally, Pickering completed a Customs security clearance form where he listed his nickname as "Kelly."

Barbara Ricketts, Pickering's supervisor at the time of the case, confirmed Pickering had unlimited airport access at that time. Ricketts also confirmed there was an airport phone next to the bookstore inside the passenger departure lounge, and that the telephone number written on Jones' boarding pass was the telephone number for the St. Thomas Port Authority, where Pickering worked prior to his arrest. She was also aware Pickering went by "Kelly." Ricketts saw Pickering with co-conspirator Turnbull and they were cordial. She noted both Pickering and Turnbull worked at the airport the day the narcotics were given to Jones.

Prior to the crime, Ricketts spoke to Pickering about his finances, and Pickering confided he was not doing well financially. Ricketts noticed, however,

4

that shortly after the time of the offense, Pickering's financial situation improved dramatically. Pickering mentioned he purchased a condominium in St. Thomas. Pickering also went on a long cruise, took a week-long vacation to Florida, and bought furniture for his new home.

Finally, the Government called Edris Merchant-Prentice, the manager of the St. Thomas Waterfront Branch of the Bank of Nova Scotia. She testified Pickering kept a savings account at the bank. The day Jones flew from St. Thomas to Atlanta with the narcotics, there was a $9,000 deposit into Pickering's account. There were no other similar deposits. Pickering also paid $15,656 in cash to cover the down payment and closing costs associated with purchasing his condominium shortly after Jones was arrested. When Pickering's counsel re-called Merchant-Prentice after the Government had rested its case, she confirmed both Pickering's and his wife's names appeared on the mortgage documents for his condominium. On cross-examination, however, Merchant-Prentice testified there was nothing in the closing documents to suggest Pickering's wife had anything to do with the down payment on the condominium.

After deliberation, the jury returned a guilty verdict on both counts of the indictment.

C. *Sentencing*

The presentence investigation report (PSI) set Pickering's base offense level at 32 pursuant to U.S.S.G. § 2D1.1(c)(4). Two levels were added pursuant to U.S.S.G. § 3B1.3 because Pickering abused his position of trust in a manner that significantly facilitated the offense. Pickering's total offense level was 34. With a criminal history category of I, Pickering's Guidelines range was 151 to 188 months' imprisonment.

Pickering objected to the PSI, arguing he should not have received an enhancement pursuant to U.S.S.G. § 3B1.3, and he should have received reductions under § 3E1.1 (acceptance of responsibility) or § 2D1.1(b)(6) (safety valve). At sentencing, Pickering withdrew his objection to the § 3B1.3 enhancement for abuse of a position of trust. The district court denied an acceptance of responsibility reduction, but granted a two-point reduction pursuant to § 2D1.1(b)(6). With a new total adjusted offense level of 32, and a Guidelines imprisonment range of 121-151 months, the district court sentenced Pickering to 121 months' imprisonment and 5 years' supervised release. Pickering's counsel argued Pickering should be sentenced to the bottom of the Guidelines range because he did not get the acceptance-of-responsibility reduction, 121 months was "an adequate sentence," he would not see his children grow up, and it was a "very

difficult sentence for him in his circumstances." The district judge stated, "I think [Pickering's counsel] is correct, that given all of the facts in the presentence report, and [Pickering's] family, that 121 months is a very substantial sentence, and therefore I will sentence you at the bottom of the Guidelines range . . . ."

## II. DISCUSSION

### A. *Sufficiency of Evidence*

Pickering asserts the evidence presented at trial was insufficient to allow a reasonable fact finder to conclude beyond a reasonable doubt that Pickering was part of a conspiracy to possess with intent to distribute cocaine. He contends the evidence presented by the Government to convict him was circumstantial, Jones' testimony was inconsistent, and Jones' identification of Pickering was unreliable. He asserts Jones could not identify him in an initial photographic lineup, and only identified him in a second photographic lineup when his picture was moved to the first one in the lineup. He contends Jones was an unreliable witness who received significant reduction in prison time as a result of her cooperation.

We review sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Ramsdale*, 61 F.3d 825, 828-29 (11th Cir. 1995). The evidence was sufficient if "a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found

7

the defendant guilty beyond a reasonable doubt." *United States v. Williams*, 144 F.3d 1397, 1401-02 (11th Cir. 1998). We must accept all of the jury's reasonable inferences and credibility determinations. *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999).

To uphold a conviction for conspiracy to distribute cocaine, the Government must offer sufficient evidence to prove that: "(1) an illegal agreement existed to possess with the intent to distribute cocaine; (2) [Pickering] knew of this agreement; and (3) [Pickering] knowingly and voluntarily joined the agreement." *United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002) (emphasis removed). Where the government's case is based on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict. *Id.* (quotations and citation omitted).

Viewing the evidence in the light most favorable to the Government, the evidence was sufficient to support Pickering's conviction. The jury was free to find Jones' testimony credible, and finding her testimony credible was not unreasonable. Jones provided a description of how Pickering met with her in a parking lot on St. Thomas and later transferred the cocaine to her in the airport bookstore. Jones called "Kelly" at Pickering's office telephone number. Other witnesses testified that Pickering's nickname was "Kelly," and that Pickering had

8

access to the secure area in the airport where the bookstore is located. Ricketts testified as to Pickering's unexplained wealth shortly after the crime was committed, and Merchant-Prentice testified as to a $9,000 deposit in Pickering's account on the day of the crime. Given the totality of the evidence, we conclude a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt, and affirm Pickering's conviction.

B. *Booker*

Pickering asserts his sentencing enhancement pursuant to U.S.S.G. § 3B1.3 for abusing a position of trust was invalid because it was not proven to a jury beyond a reasonable doubt, in violation of *United States v. Booker*, 125 S. Ct. 738 (2005). Because Pickering did not object on this ground in the district court, we review for plain error only. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir.), *cert. denied*, 125 S. Ct. 2935 (2005). Plain error is: "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (quotations and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotations and citation omitted). The defendant bears the burden of persuasion with respect to showing prejudice under the third prong. *Id.* at 1299. We have explained there are two

9

types of error under *Booker*: (1) Sixth Amendment error based upon sentencing enhancements in a mandatory Guidelines system neither admitted by the defendant nor submitted to a jury and proven beyond a reasonable doubt; and (2) statutory error based upon sentencing under a mandatory Guidelines system. *United States v. Shelton*, 400 F.3d 1325, 1329-30 (11th Cir. 2005).

Regarding Sixth Amendment error, Pickering has satisfied the first two prongs of the plain error test. There was error because the district court imposed an enhancement in a mandatory Guidelines system based on the judge's finding that Pickering abused his position of trust, a fact neither encompassed by the jury's verdict nor admitted by Pickering. *Rodriguez*, 398 F.3d at 1298. Additionally, the error was plain. *See id.* Regarding statutory error, Pickering also satisfies the first two prongs of the plain error test. The district court committed error that was plain by treating the Guidelines as mandatory. *See Booker*, 125 S. Ct. at 749-52.

Pickering, however, fails the third prong of the plain error test with regard to both Sixth Amendment and statutory error. Pickering has failed to show this error affected his substantial rights under the third prong of the plain-error test. In applying the third prong of plain error review, we ask whether there is a reasonable probability of a different result if the Guidelines were applied in an advisory fashion in this case. *Shelton*, 400 F.3d at 1332; *Rodriguez*, 398 F.3d at

10

1301. The record contains no evidence the district court would have imposed a different sentence but for the mandatory Guidelines system. Although the district judge stated that 121 months "is a very substantial sentence," a sentence at the low end of the Guidelines range, alone, is insufficient to satisfy the burden of proving the error affected a defendant's substantial rights. *See United States v. Fields*, 408 F.3d 1356, 1361 (11th Cir.), *cert. denied*, 126 S. Ct. 221 (2005). The district court did not commit plain error in sentencing Pickering.

## III. CONCLUSION

The evidence at trial was sufficient to support Pickering's conviction. Additionally, the district court did not commit plain error under *Booker* at sentencing. We affirm Pickering's conviction and sentence.

AFFIRMED.