[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 28, 2005
THOMAS K. KAHN
CLERK

No. 04-10886
Non-Argument Calendar
_____

D. C. Docket No. 03-80051-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS CANELA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 28, 2005)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Carlos Antonio Canela appeals his convictions and 111-month sentence for:

(1)   conspiracy   to   possess   with   intent   to   distribute   methylenedioxy-

methamphetamine ("MDMA"), in violation of 21 U.S.C. § 846; (2) possession with intent to distribute MDMA and cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2; (3) carrying a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) possession of marijuana, in violation of 21 U.S.C. § 844(a). On appeal, Canela argues that the district court erred by: (1) denying his motion to suppress evidence obtained during a traffic stop of his vehicle, because law enforcement officers did not have reasonable suspicion to stop the car; (2) denying his motion to suppress a post-arrest statement made before he was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and (3) sentencing him on the basis of a quantity of MDMA not charged in the indictment, or proven to a jury beyond a reasonable doubt, in violation of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), which has been extended to the Federal Sentencing Guidelines. See United States v. Booker, 543 U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). After thorough review of the record, as well as careful consideration of the parties' briefs, we affirm.

In considering a district court's denial of a defendant's motion to suppress, we review the district court's findings of fact for clear error and the district court's application of the law to those facts de novo. United States v. Gil, 204 F.3d 1347,

2

1350 (11th Cir. 2000). We will "construe the facts in the light most favorable to the prevailing party." United States v. Gordon, 231 F.3d 754 (11th Cir. 2000). Because Canela failed to raise his Booker claim in the district court, we review his sentencing issue for plain error only. See United States v. Camacho-Ibarquen, 404 F.3d 1283, 1290 (11th Cir. 2005). "An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted).

The relevant facts are these. Prior to proceeding to trial, Canela filed a pre-trial motion to suppress certain physical evidence seized from his person and vehicle during a traffic stop, for which he argued there was not probable cause or reasonable suspicion, and statements he made to law enforcement officers after the stop. The magistrate judge conducted an evidentiary hearing on Canela's motion.

Officer McDaniel, with the City of West Palm Beach Police Department ("WPBPD"), testified that, in his experience doing narcotics surveillance, he had observed individuals conducting countersurveillance for the purpose of observing police activities and making sure that the dealer does not get robbed during a sale.

3

On March 22, 2003, Officer McDaniel was parked in an undercover vehicle in the parking lot of a Books-A-Million store, waiting to "take down" the target of an undercover narcotics transaction. He stated that he had been told that there could be a second or third "target," possibly transporting the MDMA for the deal. He testified that, after the target vehicle arrived, another car, a brown Toyota Camry:

> pulled in directly next to us, stopped momentarily, and continued through to this parking space directly next to us[, which] . . . piqued my attention because in narcotics deals, . . . we are constantly moving around. This car . . . was doing what we were doing and I knew that it wasn't supposed to be there with us. . . . When this Camry came up . . . all of us ducked down . . . in case it was a secondary target or countersurveillance . . . [The driver of the Camry] positioned [his vehicle] so . . . he had an unobscured vision or view of the undercover and the target . . . The whole time . . . his vision was affixed to the undercover location and the target location. . . . It was unusual because . . . two unmarked cars . . . wouldn't have piqued anybody's interest . . . unless . . . something was actually going on.

Officer McDaniel testified that he advised, over a radio transmission, that the Camry was the possible second or third "target." Thereafter, the undercover officer ("UO") gave the signal for the "takedown," at which point Officer McDaniel saw the driver of the Camry make a telephone call on his cellular phone and then leave the scene about 10 to 15 seconds after the agents jumped out of the undercover car. When Gustavo Ardoguein, the target of the undercover transaction, was arrested, the drugs that were to be delivered were found in his possession.

4

Officer Shea, also with WPBPD, testified that, on March 22nd, he was positioned across the street from the Books-A-Million in a marked police car, in part, so that he could stop any involved vehicles if they tried to leave the parking lot. He testified that he was told, over the radio, that the target (Ardoguein) had been arrested and was armed with a firearm. He also learned that a brown Camry was leaving the scene and needed to be stopped. He subsequently pulled over the brown Camry. After approaching the driver's side, Officer Shea asked the driver (Canela) for his license, at which time Shea noticed a "large bulge" in the driver's right pocket. He then asked the driver to exit the vehicle. Officer Shea then waited for the other agents to arrive. He identified the driver as Canela.

Sergeant King, also of the WPBPD, arrived where Shea had the Camry stopped. King asked Canela if there were any guns in the car, to which Canela responded that there was an illegal gun in the glove compartment. Officer Shea stated that, at that time, he took custody of Canela, handcuffed him, and, for officer safety, grabbed the large bulge in Canela's pocket and asked him what it was. After learning that it was cocaine, Officer Shea removed the bulge from Canela's pocket. He stated that, before he grabbed the bulge, he did not know if the bulge was a weapon or not. Shea subsequently recovered more cocaine, some Ecstasy pills, and a small amount of money from Canela's person and discovered a gun in

the glove compartment of the Camry.

Special Agent Uhl, with the Drug Enforcement Administration ("DEA"), testified that, in a recorded conversation between Ardoguein and the UO, Ardoguein stated that he wanted to conduct the deal in a parking lot, but first wanted to make sure that the UO had the money. Ardoguein told the UO that he would call the person with the pills to bring them to the UO. Although Agent Uhl was not present at the Books-A-Million parking lot, he arrived at the police station shortly after Canela's arrest, at which point he spoke to Canela. Uhl walked into the interview room with Sergeant King and another agent, sat down, and said to Canela: "You were arrested today because you were observed assisting another person conduct a drug deal with an undercover agent." Special Agent Uhl testified that, at that point, Canela interrupted him and said: "As far as what I had on my person and in my vehicle, I'll take responsibility for it. I did not know what Gustavo was doing, I was only there to watch his back."

Agent Uhl then told Canela that the officers were going to give him the opportunity to assist law enforcement. He then read Canela his <u>Miranda</u> warnings. At the suppression hearing, Special Agent Uhl stated that it was typical to make an introduction prior to giving the <u>Miranda</u> warnings. After he was advised of his <u>Miranda</u> warnings, Canela indicated that he understood and then stated: "I'll take

6

responsibility for what I had.  As far as what he was doing, I didn't know anything about that. I was there to watch his back."  After he made this statement, Agent Uhl asked Canela whether he wished to assist law enforcement, and Canela stated: "I think I should speak to an attorney."  The questioning ceased at that point, and Canela was taken back to a cell.

In support of his suppression motion, Canela testified that, when Officer Shea approached the car, he asked Canela to put his hands on the window, and, when Canela asked what the problem was, Officer Shea grabbed Canela's left hand and stated that he would pull Canela out of the window if Canela did not watch himself.  Canela also claimed that Officer Shea did not release his arm until Sergeant King arrived about 30 to 40 seconds later, at which point King approached and asked for Canela's cellular phone.  King scrolled through some numbers and then told Officer Shea "[t]hat's the person."  According to Canela, at that point, the officers pulled him out of the car, and handcuffed and searched him. Canela testified that, after he was handcuffed, he told them that he had a gun in the glove compartment.

Canela also offered a different version of events at the police station after his arrest.  He testified that he was taken into an interview room and introduced to the officers, who told him, "This is where you can help yourself out" and indicated

"you have to know something, you had to get the drugs from somewhere." Canela testified that the officers advised him that he was facing 15 to 20 years' imprisonment, which surprised him since it was his first time in trouble. At that point, Canela testified, he made the statement that he was not responsible for what Ardoguein had. He claimed that only after he made the statement did the officers read his Miranda rights, after which he told them he wanted to speak with an attorney and said nothing further. According to Canela, the officers reinitiated questioning later.

Also during the hearing, the parties submitted two videotapes of the transaction, which were shot from a surveillance vehicle and contain audio transmission of the conversation between the UO and Ardoguein, including Ardoguein's following statement: "My guy is here in the parking lot."

The magistrate judge recommended that the motions to suppress be denied, finding that, pursuant to Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the initial traffic stop was supported by reasonable suspicion because: (1) law enforcement had reason to believe, from Ardoguein's representations and the fact that countersurveillance was commonly used by drug dealers, that a third party would be present in the parking lot and, therefore, had heightened sensitivity to the movement of the other vehicles in the parking lot; (2) Canela's vision was

8

fixed on the drug transaction, and he was holding a cellular phone; (3) Canela's vehicle moved to 2 different spots, but he never exited it; and (4) Canela left the parking lot 10 to 20 seconds after Ardoguein was arrested. The magistrate judge highlighted that since Officer Shea knew that Ardoguein had possessed a firearm when arrested, Shea's command to Canela to exit his car and belief that Canela might be dangerous was reasonable.

As for the decision to pat down Canela, the magistrate judge found Officer Shea's conduct justified for the purpose of determining if he had any weapons, particularly in light of Shea's knowledge that Canela had a firearm in the car and his observation of a bulge in Canela's pocket. The magistrate judge concluded that, at the point when Canela told the officers that he had cocaine in his pocket, the Terry stop was transformed into a search and seizure based on probable cause. Finally, as for Canela's pre-Miranda statement, the magistrate judge determined the statement was not made in response to questioning or its functional equivalent, as it was made in response to Agent Uhl's recitation of the charges, which was not subterfuge for trying to illicit information from Canela.

At trial, the government presented testimony that was consistent with the evidence presented at the suppression hearing. After a 5-day trial, the jury returned a verdict of guilty as to all counts. Canela then proceeded to sentencing.

The probation officer calculated a base offense level of 24, pursuant to §

2D1.1(a)(3), finding that Canela was responsible for the equivalent of 97.08 grams

of marijuana.[1]  To reach this amount, the probation officer determined Canela's

relevant conduct consisted of: (1) 107.6 grams of MDMA sold to the UO on March

22, 2003; (2) 27.6 grams of cocaine and 1.6 grams of marijuana found on

Ardoguein; and (3) 3.9 grams of MDMA, 200.4 grams of cocaine, and 1.25 grams

of marijuana found on Canela.  No adjustments were made and, with a total offense

level of 24 and criminal history category of I, Canela's presumptive range of

imprisonment was 51 to 63 months.  No more objections were lodged to the PSI, or

at sentencing.

The district court, in sentencing Canela, noted that it was taking 18 U.S.C.

§ 3553's factors into account and stated: "when you look at the combination of

these sentences, they are very very serious.  For that reason, I do think a sentence

at the low end of the guidelines is completely adequate because it gets magnified

and extended by the requirement for a consecutive sentence."  Accordingly, the

district court sentenced Canela to 51-month terms of imprisonment as to Counts 1-

---

[1] The probation officer originally set Canela's base offense level at 26, pursuant to U.S.S.G. § 2D1.1(a)(3), based, in part, on a finding that Canela was responsible for the equivalent of approximately107 kilograms of marijuana. At the sentencing hearing, the district court sustained Canela's objection to the use of the amounts of drugs sold by Ardoguein prior to March 22, 2003, and the PSI was amended to reflect this.

10

2, 5-6, and 8, to be served concurrently, and a 60-month term on Count 4, to run consecutively to the other counts. This appeal followed.

First, Canela argues that the traffic stop was based on "no more than a hunch" and that the law enforcement officers who testified at the suppression hearing could not point to specific facts that warranted the stop. "[A]n officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth Amendment." United States v. Hunter, 291 F.3d 1302, 1305-06 (11th Cir. 2002). "Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop." United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (internal quotations and citations omitted).

Factors such as an individual's proximity to the illegal activity, and flight from the scene of the illegal activity upon arrival of the police, may be considered in the totality of the circumstances. Hunter, 291 F.3d at 1306. However, "reasonable suspicion must be more than an inchoate hunch, and the [F]ourth [A]mendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop." Tapia, 912 F.2d at 1370. "A reasonable suspicion of criminal activity may be formed by observing exclusively legal

11

activity." Gordon, 231 F.3d at 754.

Here, the evidence presented at the evidentiary hearing, as outlined in the magistrate judge's Report and Recommendation, established that law enforcement officers had reasonable suspicion to stop Canela's vehicle. Accordingly, the district court did no err by denying Canela's motion to suppress evidence recovered during the traffic stop.

We likewise find no violation of Canela's Fifth Amendment privilege against self-incrimination. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda, the Supreme Court held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S. Ct. at 1612. Thus, before beginning a custodial interrogation, law enforcement officers must warn the accused that he has the right to remain silent. Id.

"Voluntary incriminating statements, however, not made in response to an officer's questioning are freely admissible." United States v. Suggs, 755 F.2d 1538, 1541 (11th Cir. 1985). The Supreme Court has held:

> Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent . . . [T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1659-60, 64 L. Ed. 2d 297 (1980). Because the evidence shows that Canela's post-arrest statements were made spontaneously and not in response to police interrogation, the district court properly denied Canela's motion to suppress the statements.

Finally, Canela argues the district court's sentence violated Blakely (now Booker). In Booker, the Supreme Court held that the mandatory nature of the Federal Sentencing Guidelines rendered them incompatible with the Sixth Amendment's guarantee of a right to a jury trial. Booker, 543 U.S. at ___,125 S. Ct. at 749-51. The Court ruled that sentencing courts nevertheless must consider the factors set forth in 18 U.S.C. § 3553(a) when imposing sentences. Id. at ___, 125 S. Ct. at 765.[2]

---

[2] Section 3553(a) provides that district courts imposing a sentence must consider, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for adequate deterrence, protection of the public, the pertinent Sentencing Commission policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a).

13

In the instant case, Canela's sentence was enhanced, under a mandatory Guidelines system, based on the judge's findings of drug amounts that were not specified in the jury verdict and not admitted by Canela. Accordingly, Canela's right to a jury trial was violated, and plain <u>Booker</u> constitutional and non-constitutional error occurred. <u>See</u> <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1297 (11th Cir.), <u>cert. denied</u> (No. 04-1148) (June 20, 2005). However, under plain error review, Canela has the burden to show that this error "affected the outcome of the district court proceedings." <u>Id.</u> (internal quotations and citations omitted). In <u>Rodriguez</u>, we explained that, in order to satisfy the third prong of the plain error test:

> [P]re-<u>Booker</u> defendants must establish a reasonable probability that if the district court had considered the guidelines range it arrived at using extra-verdict enhancements as merely advisory, instead of mandatory, and had taken into account any otherwise unconsidered [18 U.S.C.] § 3553 factors, the court would have imposed a lesser sentence than it did. That inquiry makes sense because it hooks the prejudice inquiry to the procedural change necessary to remedy the error.

<u>Id.</u> at 1302.

Because we ultimately determined that the record in <u>Rodriguez</u> "provide[d] no reason to believe any result [was] more likely than the other," we concluded that the appellant had not met his burden of showing that his substantial rights had been affected. <u>Id.</u> at 1301; <u>see</u> <u>also</u> <u>United States v. Cartwright</u>, — F.3d —, 2005

14

WL 1488416, *5 (11th Cir. Jun. 24, 2005) ("If we have to speculate concerning the result in the district court without the error, then 'the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error; he has not met his burden of showing prejudice; he has not met his burden of showing that his substantial rights have been affected.'" (quoting Rodriguez, 398 F.3d 1301)). Canela, like Rodriguez and Cartwright, can point to no place in the record indicating a reasonable probability that the district court's error in enhancing his sentence, based on extra-verdict facts in a mandatory system, affected the outcome of his sentence. Accordingly, he has not demonstrated plain error.

**AFFIRMED.**