*400
 
 SCHWARTZ, Senior Judge.
 

 The State appeals from an order in a prosecution for cocaine trafficking and conspiracy which suppressed self-incriminating statements obtained after a
 
 Terry
 
 stop the lower court found was unsupported by founded suspicion of the defendant’s involvement in criminal activity. We reverse.
 

 I.
 

 The case stems from an undercover drug arrest. On June 12, 2008, undercover detective Valdez had arranged to purchase two kilograms of powder cocaine from Marcos Lopez. The officer had previously purchased drugs from him on several occasions, in all of which he had been assisted by others. Prior to the sting, Marcos was surveilled by officers who observed him arrive at a residence and then leave with another man, whom they did not know but who turned out to be his cousin, the defendant, Elvis Lopez. Elvis followed Marcos in his own car to a Benni-gan’s parking lot. Marcos met with Valdez on the east side of the lot while the defendant parked on the south side and remained in his vehicle.
 

 After the faux transaction had been completed, a takedown unit moved in and arrested Marcos. Elvis immediately began bacldng up to leave, but Detective Oliva used his car to block and then detain him. After the stop, Elvis volunteered that Marcos owed him money, and that he was there to collect the debt from the proceeds of the sale he knew was going to take place. After the defendant agreed to accompany Oliva to the police station, he was read and waived his Miranda rights and then gave the recorded interview primarily at issue on appeal, in which he specifically admitted his involvement in the unlawful transaction.
 

 At an evidentiary hearing on the defendant’s motion to suppress, which challenged the validity of the initial investigatory stop, Valdez testified that, based on his broad experience, a second vehicle follows a vehicle involved in a drug transaction to insure that there are no law enforcement officials at the transaction site. On the same basis, Oliva stated that the defendant’s behavior gave rise to the suspicion that he was in communication with Lopez during the drug sale. Notwithstanding all of this, the lower court suppressed the admissions, ruling that the stop of which the statements were products was unjustified.
 

 II.
 

 To the contrary, we think it clear that the circumstances apparent before the stop gave rise to a founded or reasonable suspicion, as required by the Constitution, that the defendant was a principal or accomplice in the ongoing drug transaction.
 
 See Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);
 
 Baptiste v. State,
 
 995 So.2d 285, 290 (Fla.2008) (“[T]he existence of a reasonable suspicion is based upon specific and articulable facts, and the rational inferences that may be drawn from those facts.”);
 
 State v. Arango, 9
 
 So.3d 1251 (Fla. 3d DCA 2009); § 901.151(2), Fla. Stat. (2007) (“Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state ... the officer may temporarily detain such person.... ”).
 

 The contrary conclusion, which seems to have been indulged by the trial judge, amounts to a finding not only that the defendant’s actions in accompanying, following, and waiting for Marcos and then attempting to flee when he was apprehended were completely innocent and the connections to the drug deal completely coincidental, but that the police were un
 
 *401
 
 reasonable as a matter of law in thinking otherwise. To put it mildly, that conclusion is unacceptable. As observed in
 
 State v. Maya,
 
 529 So.2d 1282, 1287 n. 7 (Fla. 3d DCA 1988), these determinations do not “turn on whether an innocent explanation can possibly be conjured up from what are obviously incriminating circumstances. Rather, [they are] dependent on what a realistic view of the facts justifies or requires.” Not only can we not fault the police for stopping Elvis, but, as
 
 Terry
 
 itself says, “[i]t would have been poor police work indeed for [the] officer ... to have failed to investigate[ ][his] behavior.”
 
 Terry,
 
 392 U.S. at 23, 88 S.Ct. 1868.
 
 See
 
 Terry
 
 [1]
 
 ;
 
 U.S. v. Canela,
 
 144 Fed.Appx. 17 (11th Cir.2005)
 
 [2]
 
 , and
 
 Brown v. State,
 
 719 So.2d 1243 (Fla. 5th DCA 1998)
 
 [3]
 
 . Applying these principles, the stop was justified,
 
 Terry;
 
 § 901.151(2), and the order under review cannot stand.
 

 Reversed and remanded.
 

 [1]
 

 . "There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate the behavior.”
 
 Terry,
 
 392 U.S. at 22-23, 88 S.Ct. 1868.
 

 [2]
 

 . In
 
 Canela,
 
 an officer conducting surveillance during an undercover drug transaction in a parking lot was told that a second or third "target” may be involved. During the observation, he noticed a brown Toyota Camry, driven by the defendant and not supposed to be there, doing what he thought was counter surveillance of the area. The unusual activity piqued the officer's interest as a drug deal was already taking place. During the takedown, the car left the scene, but was stopped by another officer, resulting in the recovery of a gun and cocaine from his person.
 

 [3]
 

 .In
 
 Brown,
 
 an undercover officer arranged to purchase cocaine from an unknown drug dealer at a shopping center parking lot. The officer did not have a description of the suspect, but believed him to be a black male. The officer had provided the defendant with a description of his car and parked it diagonally over several spaces so that it would be easily identifiable. When the dealer was an hour late, the officer went to a nearby payphone to call him. Shortly after, a car driven by the a black male drove into the parking lot, circled the entire length of the lot from east to west, and pulled alongside the officer's vehicle to look inside. After doing so, the defendant drove away, circled the lot again, and once again pulled up next to the officer's car, taking a longer look before driving off. The officer radioed a patrol officer, part of the team, to stop the defendant’s vehicle. K-9 dogs signaled there were drugs in the car, and a search uncovered the evidence.