[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15292

_____

D. C. Docket No. 03-00229-CR-F-N-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALPHONSO NORMAN,
a.k.a. Scooter,
CAPULCO PERALTE,
a.k.a. Debby B. Black,
a.k.a. Cappuccino,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

**(January 11, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Alphonso Norman ("Norman") and Capulco Peralte ("Peralte") (collectively, "appellants") appeal their convictions and sentences for their roles in a three-person cocaine and crack distribution conspiracy. After review of the record and oral argument, we affirm.

## I. BACKGROUND

On September 25, 2003, an anonymous female tipster telephoned the Narcotics Bureau of the Montgomery, Alabama Police Department and informed Corporal J.T. Conway ("Conway") that there was drug activity ongoing at 2429 East 4th Street in Montgomery. The tipster advised Conway that a maroon vehicle with Florida license plates was present at the residence, and further advised Conway that the presence of that vehicle was an indication that drugs were at the residence. The tipster further stated that a black male named "Scooter" was at the residence, and in response to an inquiry from Conway, provided a phone number for the residence. Conway was previously aware that Norman, a black male, was associated with that area of 4th Street and was nicknamed "Scooter."

After receiving the anonymous tip, Conway assembled a group of Montgomery police officers to accompany him to the 4th Street residence for

surveillance purposes. The officers observed a maroon vehicle backed up beside the house. Conway then asked another officer to call the telephone number that had been provided by the anonymous tipster and to tell whomever answered that the police were coming to the house.[1]

The other officer informed Conway that the telephone call had been made in accordance with Conway's instructions. However, unbeknownst to the officers at the scene, the telephone number that was actually dialed was not the telephone number for the residence.[2] Nevertheless, despite the fact that the wrong number was dialed, just after the telephone call was completed, Norman coincidentally exited the 4th Street residence. Norman walked to the street, placed a white object into a curbside trash can located on the street in front of the house, and returned to the residence.

The officers waited a few additional minutes and observed no further activity. Conway then decided that he would initiate a "knock and talk," which is an investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for

---

[1]There was testimony that this is an investigative tactic sometimes used by police to lure individuals suspected to be involved with drug activity out of a residence.

[2]There is evidence in the record that the correct phone number for the 4th Street residence was (334) 264-3277, while the phone number actually dialed during surveillance was (334) 262-3477.

3

the police interest.

Norman and Andrew Kenny James ("James") answered the door. After Conway explained that the police had received a complaint of drug activity at the residence, he asked to search the residence. Norman and James refused this request.

During their discussion with Norman and James, officers observed a young boy located in the front room, visible from where the officers were standing outside the door. Also at this time, despite Conway's instructions to keep his hands out of his pockets, Norman continued to put his hands in his pockets. Accordingly, Conway placed the young boy—who was later identified as Norman's son—behind Conway for the boy's safety; drew his weapon on Norman and James; and conducted a patdown search of Norman. The search of Norman revealed a cell phone and money in Norman's pockets.

After the patdown search, Conway went to the curbside trash can located on the street in front of the house. Inside the trash can, sitting on top of the can's contents, Conway found a wet paper towel with a residue that appeared to be cocaine. Conway field-tested the paper towel, and it tested positive for cocaine. Conway then instructed the other officers to detain Norman and James, and he left to obtain a search warrant for the residence.

While Conway was typing his affidavit in support of the search warrant, he received a call from one of the officers at the scene advising him that the officers had located a third person—Peralte—in the house. Officers apparently heard a noise inside the house, despite having detained Norman and James and despite having sent Norman's son to the care of a neighbor. Officers then entered the house and detained Peralte, and Conway revised his affidavit to include Peralte.

Conway's affidavit in support of the search warrant stated as probable cause for the search, among other things: (1) Conway received a telephone call from a subject "A" advising that drug activity was ongoing at the 4th Street residence; (2) "A" told Conway that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) after A's phone call, Conway saw Norman exit the residence and place an object in the trash can; (4) Conway's subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery.

Conway brought the affidavit to a Montgomery Municipal Court judge and revised the affidavit (with the judge's permission) to include the vehicles at the residence. The judge then issued a search warrant that incorporated Conway's affidavit, and Conway called the other officers at the scene and instructed them to commence a search of the residence and the maroon vehicle.

5

In the residence, officers found a digital scale on top of the washing machine. Inside the washing machine, officers located a plastic bag containing commercial packing grease and $2,900 in cash. In the dryer, officers located three solid bricks of cocaine hydrochloride with a total weight of approximately three kilograms. The cocaine bricks were yellow-brown in color and appeared to have been packed in grease but subsequently wiped clean.

Under the living room couch, officers located a package containing approximately one kilogram of cocaine hydrochloride. This cocaine was inside one plastic zip-loc bag, covered with packing grease, and placed inside another zip-loc bag. In the kitchen, officers located a two-gram package of cocaine base ("crack") in a cabinet, along with another digital scale. Officers additionally discovered a hollowed-out bedpost that contained approximately $70,000 in cash, and a handgun in a closet near the front door.

Investigation revealed that the maroon vehicle with Florida license plates belonged to Peralte. The search of the maroon vehicle revealed that the passenger side airbag had been removed in order to create a hidden compartment. In the hidden compartment, officers found a zip-loc bag of the same type that held the cocaine that officers located under the living room couch.

The residue on the paper towel retrieved from the curbside trash can was

6

ultimately determined to be crack residue.

On October 29, 2003, a grand jury from the Middle District of Alabama returned a four-count indictment against Norman, Peralte, and James. Count One charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of crack, also in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts Three and Four charged the defendants with the acts of possession referenced in Counts One and Two of the indictment—specifically, knowing and intentional possession with the intent to distribute 500 grams or more of cocaine (Count Three), and knowing and intentional possession with intent to distribute a mixture or substance containing a detectable amount of crack (Count Four), in violation of 21 U.S.C. § 841(a)(1).

In June 2004, James pleaded guilty to Count One of the indictment. He subsequently testified for the government at the joint trial of Norman and Peralte.

Both Norman and Peralte filed pretrial suppression motions. The primary basis of their motions was that the anonymous telephone tip was unreliable and that probable cause did not exist for the search warrant. A magistrate judge

7

conducted a suppression hearing, and issued a report and recommendation that the motions to suppress be denied. Among other facts, the magistrate judge found that, as recounted by the police officers, there had been an anonymous tip about drug activity at the 4th Street residence and Conway had observed Norman exit the 4th Street residence and place a paper towel containing cocaine residue in the trash can. The district court adopted the magistrate's report and recommendation and denied the suppression motions. The case proceeded to trial in July 2004.

At trial, the above circumstances surrounding the surveillance and search of the 4th Street residence were introduced in evidence. Additionally, James testified that he met Peralte in 1998 and bought large quantities of cocaine from him in the late 1990s, which James in turn sold. The relationship between James and Peralte deteriorated because James "ran off" with some of Peralte's cocaine in 2000 or 2001, and James owed Peralte $12,000 as a result. Nevertheless, according to James, in approximately August 2003, Peralte reinitiated his relationship with James, and directed James to meet him at the 4th Street residence. James went to the 4th Street residence where James wanted to sell Peralte his automobile as a way to get some money and to repay his debt to Peralte, but instead, at Peralte's insistence, James agreed to sell cocaine for Peralte to repay the debt. Peralte was distrustful of James because James "ran off" with Peralte's cocaine in 2000 or

8

2001, and as a result, Peralte accompanied James on a drive around Montgomery to make the actual cocaine sales. James testified that he sold "about a [kilogram] and a half" of Peralte's cocaine at that time. This occurred approximately six or seven days prior to the police surveillance and search of the 4th Street residence in this case. James also testified that he and Peralte had "made a lot of money together."

Moreover, James testified that he had visited the 4th Street residence on multiple occasions other than the day of his arrest, and that on those occasions, sometimes Norman was present and sometimes, only Norman's girlfriend was present. Detective Chris Wingard ("Wingard") testified that the actual resident of the 4th Street house was a woman named Tammy Montgomery ("Montgomery"), Norman's girlfriend.[3]

James further testified that Norman and Peralte had "started . . . seeing each other," and "started dealing with each other," and that he believed the 4th Street residence was Norman's residence. Additionally, James testified that because he

---

[3]On appeal, Norman argues that this testimony was inadmissible hearsay. We review a district court's evidentiary rulings for abuse of discretion. See United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir.), cert. denied, 126 S. Ct. 732 (2005). Wingard testified without objection that Montgomery was the actual resident of the 4th Street house, but Norman objected to Wingard's testimony that Montgomery was Norman's girlfriend. Because James testified without objection that Montgomery was Norman's girlfriend, and thus that same evidence came in through another witness, we need not resolve the hearsay issue as the evidentiary error, if any, was harmless.

had "ran off" with some of Peralte's cocaine and owed Peralte money, when James went to the 4th Street residence in the days prior to the search of the residence, both Norman and Peralte were "telling jokes" about snakes. According to James, and taking all inferences in favor of the government, at the 4th Street residence, Norman and Peralte joked that James was like a snake because Peralte was taking another "chance on dealing [drugs] with [James]," despite the fact that "every time" Peralte had previously been engaged in drug activity with James, James had run off with Peralte's money or drugs.

Finally, James testified that Peralte told him that he could "get some money" by get[ting] [Peralte] some sales for some powder" cocaine, and that James had "sold a lot of drugs for Peralte."

The jury convicted Norman and Peralte on all four counts of the indictment. The district court had the jury complete a special verdict form. For each count of conviction, the jury was instructed to answer a multiple-choice question regarding the quantity of relevant drugs that each defendant possessed or conspired to possess. The jury expressly found that both Norman and Peralte conspired to possess with intent to distribute between 3.5 and 5 kilograms of cocaine (Count 1); conspired to possess with intent to distribute between 2 and 3 grams of crack (Count 2); possessed with intent to distribute between 3.5 and 5 kilograms of

10

cocaine (Count 3); and possessed with intent to distribute between 2 and 3 grams of crack (Count 4). Both Norman and Peralte moved for judgments of acquittal and judgments notwithstanding the verdicts, and the district court denied those motions.

On October 1, 2004, Norman and Peralte were sentenced. Prior to sentencing, a probation officer prepared a Pre-Sentence Investigation report ("PSI"), utilizing the November 2003 edition of the United States Sentencing Guidelines. Norman's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury attributed to Norman. The PSI also recommended a two-level increase in Norman's offense level based on the firearm that was found in the residence, for a total recommended offense level of thirty-two. Based on Norman's criminal history category of III, the PSI calculated Norman's guidelines range at 151-188 months' imprisonment.

At sentencing, Norman's counsel objected to the quantity of drugs attributed to him by the jury and further objected to the proposed firearm enhancement. Norman's counsel also emphasized that Norman had no control over the premises where he was arrested and only had a right to go there because his girlfriend and child lived there, such that a minor role reduction was appropriate. The district

11

court sustained Norman's objection regarding the firearm enhancement, but overruled his objection regarding the quantity of drugs and rejected the request for a minor role reduction.

After rejecting the firearm enhancement recommended by the PSI, the district court calculated Norman's offense level at thirty and his criminal history category at III, which placed Norman's guidelines range at 121-150 months' imprisonment. The district court then sentenced Norman to 121 months' imprisonment on each of the four counts, to be served concurrently. The district court specifically stated that it sentenced Norman to a 121-month term of imprisonment due to the nature of the offense, to deter future wrongful conduct, and to punish Norman.

Just as in Norman's case, Peralte's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury had attributed to Peralte. Likewise, Peralte's PSI also recommended a two-level increase based on the firearm found in the residence, such that Peralte's PSI recommended an adjusted offense level of thirty-two. Because Peralte's criminal history category was also III, the PSI calculated Peralte's guidelines range at 151-188 months' imprisonment.

Peralte objected to the PSI, arguing that pursuant to Blakely v. Washington,

12

542 U.S. 296, 124 S. Ct. 2531 (2004), he could not receive a firearm enhancement because the enhancement was not charged in the indictment. The district court sustained Peralte's objection to the firearm enhancement at sentencing, finding that the evidence did not support the application of the enhancement. The district court subsequently calculated Peralte's offense level at thirty, his criminal history category at III, and his guidelines range at 121-151 months' imprisonment. The district court then sentenced Peralte to 145 months' imprisonment on each of the four counts, to be served concurrently. The district court stated that it sentenced Peralte to 145 months' imprisonment due to the nature of the offense and its seriousness, as well as to promote respect for the law based on Peralte's "criminal history in the drug crime area."

Norman and Peralte timely appealed.

## II. DISCUSSION

On appeal, Norman and Peralte argue that: (1) the district court erred in denying their motions to suppress the evidence recovered from the 4th Street residence;[4] (2) the evidence presented at trial was insufficient to support their

---

[4]We review the denial of a motion to suppress evidence as a mixed question of law and fact. We review the district court's findings of fact for clear error and the district court's application of the law to those facts de novo. The facts are construed in favor of the party that prevailed in the district court. See United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003); United States v. Hall, 47 F.3d 1091, 1094 (11th Cir. 1995).

convictions; and (3) the district court should have severed their trials.[5]

Additionally, Norman argues that the search warrant for the 4th Street residence was invalid because it was obtained in violation of Rule 41 of the Federal Rules of Criminal Procedure, and Peralte argues that the district court improperly failed to grant him a jury instruction on the purported "buyer-seller" relationship between himself and James.[6]  Finally, both appellants raise sentencing issues.  Norman primarily argues that the district court erred in denying him a minor role reduction and in concluding that the drugs at the 4th Street residence were attributable to him (as opposed to his co-defendants).   Peralte argues that the district court committed statutory error under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), by sentencing him under a mandatory guidelines scheme.

After oral argument and careful review of the record in this case, as well as the arguments of the parties in their briefs, we conclude that all of appellants' claims of error lack merit.  Further discussion is warranted only as to appellants' motions to suppress, their argument that the government's evidence was insufficient to establish a conspiracy, and their sentencing claims.

---

[5]We review the denial of a motion for severance for abuse of discretion.  United States v. Talley, 108 F.3d 277, 279 (11th Cir. 1997).

[6]We review a district court's rejection of a proposed jury instruction for abuse of discretion.  United States v. Garcia, 405 F.3d 1260, 1273 (11th Cir. 2005).

## A.    Motions to Suppress

On appeal, appellants challenge the district court's denial of their motions to suppress the evidence obtained pursuant to the search warrant.  Appellants' main argument is that the warrant was not supported by probable cause.

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  Furthermore, "'[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.'"  Id.  (citation and alterations omitted).  "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).

In this case, Conway's affidavit in support of the search warrant stated that probable cause existed because: (1) the police received an anonymous telephone call that drug activity was ongoing at the 4th Street residence; (2) the anonymous caller informed police that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) Conway observed Norman exit the residence and place an object in the trash can; (4) Conway's

15

subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery. We readily conclude that the affidavit in this case was more than sufficient to establish probable cause. See United States v. Vahalik, 606 F.2d 99, 100 (5th Cir. 1979)[7] ("The garbage produced syringes, needles, and other implements that contained traces of methamphetamine; these items, sifted from garbage bags that appellant had placed at the edge of the street for collection, provided the probable cause basis for issuance of the warrant for the subsequent search of appellant's residence.").

Appellants also argue that Conway lied when he claimed to have discovered cocaine in the trash can. However, the magistrate judge heard the evidence and made a specific fact-finding that Conway went to the trash can and found the paper towel, which "looked like what [Conway] had seen Norman drop in the garbage can earlier." The magistrate judge also made a specific fact-finding that inside the paper towel, Conway found shavings of what appeared to be cocaine. The district court adopted the magistrate judge's findings of fact and the magistrate judge's recommendation that the motions to suppress be denied. The findings of fact were supported by the evidence and were not clearly erroneous, and as such we reject

_____

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

16

appellants' argument that Conway lied as without merit.[8]

Because probable cause supported the search warrant in this case, the district court properly denied appellants' motions to suppress.[9]

## B.    Conspiracy Convictions[10]

The crux of appellants' attack on their conspiracy convictions is that the trial evidence at best established their "mere presence" at the 4th Street residence and thus was insufficient to establish either participation in a drug conspiracy or an intent to distribute the drugs located at the residence.

---

[8]Appellants' argument that the warrant was improperly signed is also without merit and is not discussed further.

[9]We recognize that Norman also argues that his initial detention and Conway's patdown search were illegal. During his search of Norman's person, Conway removed Norman's cell phone on the chance that it was a weapon. Upon determining that Norman's phone was not a weapon, Conway immediately returned the phone to Norman. Additionally, Conway recognized the money for what it was during the patdown, and as such Conway did not remove the money from Norman's pocket during this initial search.

We need not determine whether the detention and search were illegal, because no evidence—neither Norman's cell phone, nor Norman's money, nor any statements made by Norman—was used as part of Conway's affidavit in support of the search warrant. As outlined above, probable cause existed for the search warrant and that probable cause consisted of the anonymous tip and Norman's placement of a paper towel with cocaine residue in the trash can, all of which occurred before the detention and patdown search. See United States v. Davis, 313 F.3d 1300, 1304 (11th Cir. 2002) ("[E]ven if we assume that the initial search was invalid and that anything related to that search was the fruit of the poisonous tree, the gun's seizure was valid because it had been purged of the 'taint' of the allegedly illegal search. In other words, the firearm, which was recovered pursuant to an independent source, i.e., the third warrant, was admissible . . . .").

[10]We review a challenge to the sufficiency of the evidence de novo, taking all reasonable inferences in favor of the government and the jury's verdict of conviction. United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999).

17

In order to sustain a drug conspiracy conviction, the government must establish that two or more people agreed to distribute the drugs; that the defendant knew of the general purpose of the agreement; and that the defendant knowingly and voluntarily joined the agreement. See United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000). "Because the crime of conspiracy is 'predominantly mental in composition,'" the crime is often provable only via circumstantial evidence. United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (citation omitted). Additionally, although appellants are correct that "[m]ere presence alone . . . is not indicative of a conspiracy," it is also true that a defendant's "presence is material and probative in the totality of the[] circumstances." United States v. Jenkins, 779 F.2d 606, 612 (11th Cir. 1986).

Here, viewing the evidence in the light most favorable to the government, there is clearly sufficient circumstantial evidence to sustain both appellants' conspiracy convictions. Among other things, the evidence, in the light most favorable to the government, shows the following: An anonymous caller advised Conway that there was a maroon vehicle present at the 4th Street residence, and when that vehicle was present, there were generally drugs at the residence. The anonymous caller also told Conway that a black male named "Scooter" was at the 4th Street residence, and Norman's nickname was "Scooter." Shortly after the

18

phone call, based on surveillance conducted as a result of the phone call, Norman was seen to exit the residence and deposit an object in the trash can directly outside the residence. The object thrown away by Norman was a wet paper towel containing crack residue. A subsequent search of the residence itself revealed several kilograms of cocaine (including three bricks of cocaine weighing approximately one kilogram each), a small amount (approximately two grams) of crack, cocaine packaging, digital scales, and over $70,000 in cash. Peralte and James were also located in the residence. The residence belonged to Norman's girlfriend. The maroon vehicle was Peralte's, and in a hidden compartment in Peralte's vehicle, there was cocaine packaging similar to the cocaine packaging found in the residence.

With regard to Peralte's participation in the conspiracy, James testified that Norman and Peralte had "started . . . seeing each other" and "started dealing with each other," and that he had met Peralte at the 4th Street residence to purchase cocaine from Peralte about six or seven days prior to the police search of the 4th Street residence. James further testified that at that time, Peralte accompanied James on a car ride around Montgomery to sell approximately one and a half kilograms of Peralte's cocaine to "various people," and that previously, in the late 1990s, James had purchased large quantities of cocaine from Peralte and sold it in

19

crack form. James also testified that Peralte told him that he could "get some money" by "get[ting Peralte] some sales for some powder" cocaine; that James had "sold a lot of drugs for Peralte"; and that James and Peralte had "made a lot of money together."

As for Norman, the evidence also shows more than mere presence at a residence with large amounts of drugs. The evidence shows presence under a set of circumstances and with conversation that raises an inference that Norman intentionally and knowingly was involved in the drug conspiracy. Specifically, again, James testified that Norman and Peralte had "started . . . seeing each other" and "started dealing with each other." James also testified that just a few days prior to the police search of the 4th Street residence, James had met Peralte at the 4th Street residence (which James believed to be Norman's residence) in order to obtain cocaine from Peralte to sell, and that he sold about a kilogram and a half of Peralte's cocaine at that time. Additionally, the anonymous telephone call placed Norman at the residence at the time of drug activity, and indeed, Norman was at the residence with drugs. More importantly, on the day that cocaine was seized from the residence, Norman exited the residence with a paper towel containing cocaine residue. Further, James testified that during his time at the 4th Street residence in the six or seven days prior to the police search of the residence, both

20

Norman and Peralte were joking that James was like a snake in that Peralte was once again willing to participate in drug activity with James even after James had previously stolen from Peralte.  This circumstantial evidence was sufficient to support the conclusion that Norman and Peralte were involved in the distribution of drugs from the 4th Street residence and that Norman allowed Peralte to use his girlfriend's residence to sell drugs and cook crack.

As this Court has said numerous times, "[a] conspiracy conviction will be upheld if there is sufficient positive indication that an illegal agreement exists, or when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him."  United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983) (internal citation omitted); see also United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990).  Moreover, "in elaborating on the mere presence defense, this [C]ourt has stated" that

> [i]n most cases . . . the evidence establishes not mere presence but presence under a particular set of circumstances.  In such a case the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric.  Rather, it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation.

Parrado, 911 F.2d at 1570 (quotation marks and citation omitted).  Here, the

21

evidence reflects more than just both Norman's and Peralte's presence at the 4th Street residence; instead, the circumstances of their presence, as shown by that evidence, are such that a reasonable jury could have inferred that they were both knowing and intentional participants in an agreement with each other and with James to distribute cocaine and crack.

## C.    Sentencing

We first address Norman's argument that the district court erred in "attributing all relevant conduct" to him, particularly with regard to the drug quantity determinations.[11]  According to Norman, the evidence failed to demonstrate that he had any "authority, possession, or control over the residence" or knowledge about the drugs in the residence, such that his base offense level should not have exceeded twelve (the appropriate base offense level for a cocaine offense for which no drug quantity can be attributed).  See U.S.S.G. § 2D1.1(c)(14) (2003).  However, as discussed above, we reject Norman's argument that he was "merely present" at the 4th Street residence.  Moreover, the drug quantity determinations were made by the jury, not by the district court, such that Blakely and Booker are not implicated by Norman's argument, and the drug quantity

---

[11]We review Norman's objection to the district court's drug quantity determinations for clear error.  United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir.), cert. denied, 125 S. Ct. 2935 (2005).

22

determinations themselves were amply supported by the testimony of Clyde Norwood ("Norwood"), a forensic chemist.

Indeed, Norwood testified at trial to his analysis of each of the substances seized by the police from the 4th Street residence where Norman was arrested. Specifically, Norwood testified that: (1) the paper towel contained crack cocaine residue; (2) the three bricks taken from the dryer contained 2,950 grams, or just under three kilograms, of cocaine; (3) the package taken from under the couch contained approximately 981 grams of cocaine; and (4) the package taken from the kitchen contained approximately 2.1 grams of crack. All of these specific drug quantity calculations were included in the jury's verdict. Because the district court's drug quantity determination was based on the amount of drugs attributed to Norman by the jury, and because the evidence supports the jury's drug quantity determination, the district court did not clearly err in sentencing Norman based on those drug quantity determinations.[12]

The district court likewise did not clearly err in refusing to grant Norman a minor role reduction.[13] The sentencing guidelines provide for a four-level decrease

---

[12]Norman's brief also asserts that the district court committed error pursuant to Blakely and Booker, by enhancing his sentence based on the firearm discovered in the residence. The district court specifically declined to impose a firearm enhancement, and thus this sentencing argument is without merit and not discussed further.

[13]We review a district court's denial of a minor role reduction for clear error. United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

in offense level if a defendant was a "minimal participant"; a two-level decrease if a defendant was a "minor participant"; and a three-level decrease for cases in between the two. U.S.S.G. § 3B1.2. A district court is required to assess whether a defendant was a minor or minimal participant with regard to the relevant conduct attributed to the defendant, and is further required to assess whether the defendant was a minor or minimal participant as compared to other identifiable participants in the relevant conduct attributed to the defendant. See United States v. De Varon, 175 F.3d 930, 940-44 (11th Cir. 1999) (en banc). It is possible that there will be no minor or minimal participants. Id. at 944.

Here, the district court expressly found that "the testimony and the evidence . . . would not support" a minor or minimal participant reduction for Norman under U.S.S.G. § 3B1.2. Although Norman again argues that he was merely "present" at the 4th Street residence and was entitled to a minor role reduction, the evidence established otherwise. Indeed, although we do not again re-hash the evidence against Norman, we note that Norman was the only one of the three defendants actually seen by police with drugs in his possession (specifically, the paper towel). Moreover, the amount of drugs attributed to Norman as relevant conduct was the same amount of drugs that was located in the residence and the same amount of drugs that Norman was ultimately convicted of conspiring with Peralte to distribute

24

from his girlfriend's residence. Accordingly, the district court did not clearly err in refusing to grant Norman a minor role reduction.[14]

Finally, we address Peralte's argument that the district court committed Booker error by sentencing him under a mandatory guidelines regime. There are two types of Booker error, constitutional and statutory. United States v. Mathenia, 409 F.3d 1289, 1291-92 (11th Cir. 2005). "The constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge; the error is in the mandatory nature of the guidelines once the guidelines range has been determined." United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, 125 S. Ct. 2935 (2005). Meanwhile, "statutory

---

[14]On appeal, Norman also argues in passing and for the first time that, pursuant to Booker, he was entitled to have a jury determine whether he should have received a minor role reduction. We review Norman's Booker claim for plain error. Norman's claim fails because (1) Booker did not create any right to jury determinations at sentencing, and (2) Booker involved the application of extra-verdict enhancements in a mandatory guidelines system, and not sentencing reductions in a mandatory guidelines system. See Rodriguez, 398 F.3d at 1300-01. In any event, Norman has not shown that it was plain error for the district court, rather than the jury, to evaluate the appropriateness of the minor role reduction.

We also note that Norman's counsel conceded at oral argument that a claim of statutory Booker error was not raised on appeal—in other words, a claim of error for Norman being sentenced under a mandatory guidelines scheme—because Norman was sentenced to the statutory mandatory minimum sentence. For the sake of thoroughness, we note that the statutory mandatory minimum sentence for a defendant convicted of violating 21 U.S.C. §§ 841 and 846 is ten years, or 120 months, when that defendant has a prior felony drug conviction and the offense at issue involves between 500 grams and 5 kilograms of cocaine. See 21 U.S.C. § 841(b)(2)(B)(ii)(II). Norman was sentenced to 121 months' imprisonment, which was at the bottom end of his guidelines range, but one month more than his statutory mandatory minimum sentence. Because Norman does not raise a statutory Booker claim, we do not reach the merits of such a claim.

25

error occurs when the district court sentences a defendant 'under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation.'" Mathenia, 409 F.3d at 1291 (citation omitted). Given that the jury determined the drug quantities, and given that the district court denied the government's request for a firearm enhancement, there were no extra-verdict enhancements. Thus, Peralte raises a claim of Booker statutory error.

Because Peralte raised his Booker claim in the district court, we review the claim de novo. Here, the government correctly concedes that the district court committed statutory Booker error by sentencing Peralte under a mandatory guidelines system. However, the government argues that such error was harmless.

There are different harmless error standards for claims of constitutional Booker error and claims of statutory Booker error. Mathenia, 409 F.3d at 1291. Here, we apply the "less demanding test that is applicable to non-constitutional" (i.e., statutory) errors. Id. at 1292. Statutory Booker error

> is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the sentence, or had but very slight effect. If one can say with fair assurance that the sentence was not substantially swayed by the error, the sentence is due to be affirmed even though there was error.

Id. (quotation marks, alterations, and citations omitted). The government bears the

burden of showing that the statutory <u>Booker</u> error was harmless.[15]  <u>Id.</u>

This Court has previously found statutory <u>Booker</u> error to be harmless.  For instance, in <u>United States v. Gallegos-Aguero</u>, 409 F.3d 1274, 1277 (11th Cir. 2005), we found statutory <u>Booker</u> error harmless where the district court sentenced the defendant to the highest sentence available under the applicable guidelines range and expressly considered sentencing the defendant to the statutory maximum.  Similarly, in <u>United States v. Mejia-Giovani</u>, 416 F.3d 1323, 1326 (11th Cir. 2005), we found statutory <u>Booker</u> error harmless where the defendant was sentenced in the middle of the applicable guidelines range and the district court expressly stated at sentencing that the defendant was at risk for an upward departure; that its patience with the defendant was running thin; and that it saw no potential benefit in the defendant's argument that the guidelines should not be applied.  <u>Cf.</u> <u>United States v. Glover</u>, __ F.3d __, No. 04-16745, 2005 U.S. App. LEXIS 25675, at *10-14 (11th Cir. Nov. 29, 2005) (statutory <u>Booker</u> error not harmless where district court imposed sentence in middle of applicable guidelines range and there were no statements in the record suggesting that the district court would have imposed the same or greater sentence under an advisory guidelines

---

[15]For preserved claims of constitutional <u>Booker</u> error, the government must meet the more demanding burden of showing "beyond a reasonable doubt . . . that the error did not contribute to the defendant's ultimate sentence."  <u>Mathenia</u>, 409 F.3d at 1291.

27

scheme).[16]

Here, we conclude that there are sufficient statements in the record showing that the district court would have imposed the same sentence under an advisory guidelines scheme. The record shows that Peralte's final guidelines range was 121-150 months' imprisonment. The middle of the guidelines range was 135.5 months. Norman and Peralte had identical offense levels and criminal history categories, and the district court sentenced Norman to the low end of the identical guidelines range (121 months' imprisonment). Peralte's counsel specifically argued at Peralte's sentencing that Norman's just-imposed 121-month sentence favored an identical (low end) sentence for Peralte. However, the district court rejected that request and sentenced Peralte to the higher end of the guidelines range (145 months' imprisonment).

In imposing its sentence, the district court specifically stated that the 145-month sentence was "imposed due to the nature of the offense and to reflect the

---

[16]In United States v. Cain, __ F.3d __, No. 04-15754, 2005 U.S. App. LEXIS 28882, at *5-9 (11th Cir. Dec. 29, 2005), this Court concluded that constitutional Booker error was not harmless even though the district court had imposed a sentence at the top of the applicable guidelines range. However, in Cain, the district court made no statement indicating that it would have imposed the same or a higher sentence if it had possessed the discretion to do so. Instead, the district court merely stated that a sentence at the high end of the guidelines was "'appropriate.'" Id. at __, 2005 U.S. App. LEXIS 28882, at *9. Moreover, in Cain, we expressly declined to consider whether the outcome might have differed if the defendant had raised a claim of statutory Booker error instead of his claim of constitutional Booker error. Id. at __, 2005 U.S. App. LEXIS 28882, at *8 n.3.

28

seriousness of the offense," and further stated that the sentence was based on Peralte's "criminal history in the drug crime area to promote respect for the law."

In addition, after the district court imposed its 145-month sentence, it solicited final objections. Peralte's counsel argued this time that Peralte was at worst entitled to a sentence of 139 months' imprisonment, which Peralte's counsel termed the middle of the guidelines range, because Peralte's PSI had initially recommended that he receive a mid-range sentence (albeit within the higher recommended guidelines range of 151-188 months' imprisonment).[17] The district court rejected this final argument and imposed the 145-month sentence as stated.

Accordingly, the record clearly shows that the district court recognized that it had the authority and discretion to reduce Peralte's sentence from 145 months' imprisonment to either the mid-range sentence of approximately 135 months' imprisonment or the low end sentence of 121 months' imprisonment. However, the district court twice refused to do so. More importantly, the district court explicitly stated that the 145-month sentence was imposed due to the nature of the offense, the seriousness of the offense, Peralte's criminal history, and to promote respect for the law. Thus, the record adequately indicates that the district court would have imposed the same 145-month sentence under an advisory guidelines

---

[17]We note that, in actuality, the PSI did not recommend a mid-range sentence for Peralte.

29

regime, and we conclude that the statutory <u>Booker</u> error in this case "did not affect

[Peralte's] sentence, or had but very slight affect." <u>Mathenia</u>, 409 F.3d at 1929

(quotation marks, alteration, and citations omitted).

## III. CONCLUSION

For all of the above reasons, we affirm appellants' convictions and

sentences.

**AFFIRMED.**